

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-4-2002

# Stonington Partners v. Lernout Hauspie

Precedential or Non-Precedential: Precedential

Docket No. 01-3636

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Stonington Partners v. Lernout Hauspie" (2002). *2002 Decisions.* Paper 697.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/697

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 4, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3636

STONINGTON PARTNERS, INC.;
STONINGTON CAPITAL APPRECIATION 1994
FUND, L.P.; STONINGTON HOLDINGS, L.L.C.,
Appellants

v.

LERNOUT & HAUSPIE SPEECH PRODUCTS N.V.;
DICTAPHONE CORP;
L&H HOLDINGS USA INC.

*OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
Intervenor in Bankruptcy Court

(*AMENDED per clerk's order of 2/8/02)

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 01-cv-00594)
District Judge: Honorable Joseph J. Farnan, Jr.

Argued June 13, 2002

Before: ROTH, RENDELL, and ROSENN, Circuit Jud ges

(Filed: November 4, 2002)


Alan S. Goudiss, Esq. [ARGUED]
Shearman & Sterling
599 Lexington Avenue
New York, NY 10022

Brendan L. Shannon, Esq.
Young, Conaway, Stargatt & Taylor
P. O. Box 319
1000 West Street
Brandywine Building, 17th Floor
Wilmington, DE 19899
 Counsel for Appellants
Stonington Partners, Inc.;
Stonington Capital Appreciation
1994 Fund, L.P.; Stonington
Holdings, L.L.C.

Luc A. Despins, Esq. [ARGUED]
Milbank, Tweed, Hadley & McCloy
One Chase Manhattan Plaza
New York, NY 10005

        Francis A. Monaco, Jr., Esq.
        Walsh, Monzack & Monaco
        1201 North Orange Street
        400 Commerce Center
        Wilmington, DE 19899
         Counsel for Appellees
        Lernout & Hauspie Speech
        Products N.V.

        Ira S. Dizengoff, Esq. [ARGUED]
        Akin, Gump, Strauss, Hauer & Feld
        590 Madison Avenue
        New York, NY 10022
         Counsel for Appellees
        Dictaphone Corp;
        L&H Holdings USA Inc.

                        2


OPINION OF THE COURT

RENDELL, Circuit Judge:

Lernout & Hauspie Speech Products, N.V., ("L&H") filed
for relief under the Bankruptcy Code in the United States
Bankruptcy Court for the District of Delaware on November
29, 2000. One day later, it filed a second plenary insolvency
proceeding under the laws of Belgium, its place of
incorporation. Perhaps predictably, conflicts arose
thereafter as to the applicable laws and appropriate
jurisdiction for resolving certain issues. The District of
Delaware resolved those issues in favor of the debtor and
against appellant, Stonington Partners, Inc., et al. The
District Court affirmed.

We conclude that the order preventing Stonington from
pursuing the issue of the priority, treatment, and
classification of its claims in the Belgian proceedings and
ordering that these issues be determined exclusively by the
Delaware Bankruptcy Court in accordance with the
Bankruptcy Code was issued without consideration of all
relevant legal principles. Accordingly, we will reverse and
remand for further proceedings consistent with this
opinion.

I. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C.
S 158(a) and we have jurisdiction based on 28 U.S.C.
S 158(d). Because the District Court sat as an appellate
court, we apply plenary review to its judgment and thus
apply the same standards that it applied. In re Professional
Ins. Mgmt., 285 F.3d 268, 282 (3d Cir. 2002). Accordingly,
"we review the Bankruptcy Court's legal determinations de
novo, its factual findings for clear error, and its exercises of
discretion for abuse thereof." Id. at 282-83. We review the
extension or denial of comity for abuse of discretion, see
Remington Rand Corp. v. Business Sys. Inc., 830 F.2d 1260,

1266 (3d Cir. 1987), and have applied an abuse of discretion standard to entry of an anti-suit injunction as

well, see Compagnie des Bauxites de Guinea v. Insurance Co. of N. America, 651 F.2d 877, 887 (3d Cir. 1981), aff 'd on other grounds, 456 U.S. 694 (1982). "A bankruptcy court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts." In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 122 (3d Cir. 1999).

II. Facts and Procedural History

As is usual in complex bankruptcy proceedings such as these, an understanding of the facts is essential to our ruling. Of the plethora of known facts surrounding the matter before us, the following are those most relevant to our reasoning.

Stonington is an ERISA fiduciary that manages institutional capital on behalf of various public and private entities, including pension funds, private endowments, and financial institutions. It purchased Dictaphone Corporation in 1995 and, according to Stonington, "built it into the healthcare area's leading provider of dictation, transcription and patient information management solutions."

L&H, a corporation that specializes in speech recognition technology and related products, was incorporated in Belgium and has headquarters in Burlington, Massachusetts, and Ieper, Belgium. L&H acquired Dictaphone from Stonington in mid-2000. In November 2000, Stonington filed an action in Delaware Chancery Court against L&H and several former L&H officers and directors alleging that L&H's acquisition of Dictaphone from Stonington was in exchange for worthless L&H stock and was procured by fraud ("the Delaware Fraud Action"). The officer and director defendants were ultimately arrested and jailed in Belgium on charges of securities fraud, and the Delaware Fraud Action was later removed to federal court and is now an adversary proceeding in the Delaware bankruptcy case of L&H. On November 28, 2000, the day after Stonington filed the Delaware Fraud Action, Stonington sought and obtained a Belgian court order directing L&H to turn over its shares of Dictaphone to a court-appointed trustee.

On November 29, 2000, L&H filed a Chapter 11 petition in the United States District Court for the District of Delaware. The next day, L&H filed for bankruptcy protection in Belgium by filing a Petition for Concordat under Belgian law. There were, and have been, dual insolvency proceedings (or perhaps we could say,"dueling" proceedings) in the two jurisdictions. Stonington filed claims against L&H in both proceedings arising out of the

Dictaphone merger based on L&H's fraudulent activities and misrepresentations in connection with the transaction (the "Dictaphone Merger Claims"). Although L&H challenged Stonington's claims in the Belgian proceeding, the Belgian court allowed the claims.

The present dispute centers on the treatment of the Dictaphone Merger Claims. Stonington asserted the right to pursue allowance and treatment of these claims in Belgium, where they would be treated as unsecured claims, on a parity with other unsecured creditors, and where they would not be subject to subordination, as would be called for under section 510 of the Bankruptcy Code. It is clear that L&H desired that section 510(b) should be applied to Stonington's claims, and seems that the amount of Stonington's claims -- estimated to be $500 million -- would, in combination with the other 510(b) claims, dwarf the unsecured claims if not subordinated.1

Both the Delaware Bankruptcy Court and the Belgian court have expressed views on this issue. In May 2001, in the Delaware bankruptcy proceedings, L&H sought a declaratory judgment that any claim asserted by Stonington in the Delaware Bankruptcy Court would be subject to mandatory subordination under section 510(b).2 In granting L&H the declaratory relief it requested, the Bankruptcy Court ruled:

_____

1. At the August 2001 oral argument, L&H's attorney indicated that Stonington claimed $500 million, and that the 510(b) claims totaled two or three billion dollars, overwhelming the approximately $500 million dollars of non-510(b) claims.

2. L&H pursued this relief by filing an amended complaint and a motion for partial judgment on the pleadings or, alternatively, partial summary judgment, on its fourth cause of action, seeking subordination under 510(b).

5

> The claims asserted by Stonington in the Delaware
> Chancery Court Action . . . are hereby determined to be
> pre-petition claims that are subject to mandatory
> subordination under section 510(b) of the Bankruptcy
> Code, such that, should Stonington ever file a proof of
> claim in these Bankruptcy Cases . . . based upon these
> claims, the claims asserted therein would have the
> same priority as the common stock of L&H.

The Bankruptcy Court reasoned that Stonington's claims arose "from recission of a purchase or sale of a security of the debtor" and that even Stonington's breach of conflict claims were encompassed in the category of claims "for damages arising from the purchase or sale of such a security." Stonington did not appeal this ruling. The Bankruptcy Court disclaimed any intention of "dictating in any way to the Belgian court what their application of Belgian law might be," and left open the possibility that the

Belgian court would "rule that under Belgian law the plan as proposed cannot be confirmed," leaving debtors in a "Catch-22."

The Belgian court appears to have done exactly that. In the Belgian court, L&H sought to confirm a reorganization plan that would have subordinated Stonington's claims, but the Belgian court rejected the plan based on principles of Belgian bankruptcy law that required equal treatment, rather than subordination, of such claims. In its order of June 20, 2001, rejecting the plan, the Belgian court held that "[t]here is no legal justification for the distinction made within the category of general secured and unsecured creditors as it is not based on general and objective criteria." L&H did not appeal this ruling in Belgium. On Sept. 18, 2001, the Belgian court apparently again rejected an American-style plan proposed by L&H.

It was thus apparent that L&H and Stonington were "at odds" over a "true conflict" between Belgian and United States law. In fact, Stonington's Belgian counsel suggested that L&H dismiss its Chapter 11 case because of the "impossible mission" of "combin[ing] the irreconcilable requirements of Belgian and of U.S. law." L&H did not follow this advice.

After various proceedings, whose details are not crucial here, L&H then filed a second amended complaint against Stonington, and moved for partial judgment on the pleadings or partial summary judgment on a newly added sixth cause of action, the so-called "Forum Selection Claim." In this cause of action, L&H maintained that there was a "true conflict" between Belgian and U.S. law and that:

> It is Stonington's position that it can -- notwithstanding its filing of proofs of claim in and acknowledged submission to the equitable jurisdiction of this Court -- pursue allowance of the Dictaphone Merger Claims solely in Belgium. If it is allowed to do so, it will avoid the effects of this Court's determination that those claims should be subordinated to the level of L&H common stock, and potentially obtain payment of those claims pari passu with the rest of L&H's general unsecured creditors.

> The L&H Group, by contrast, maintains that the fact that the relevant relationship between Stonington and L&H is centered exclusively in the U.S. requires that all matters relating to the Dictaphone Merger Claims, including the priority, allowance, and treatment thereof, be adjudicated by this Court under the Bankruptcy Code.

L&H had specifically sought declaratory relief, as opposed to injunctive relief, in its motion and as to this particular cause of action in its second amended complaint, although

it also included a general prayer for any other relief the Court deemed appropriate. In the memorandum accompanying its motion, L&H argued that the requirements for declaratory relief had been satisfied. It did not seek injunctive relief, or claim to have met the requirements for entry of an injunction, or even address the applicable standards for granting injunctive relief.

In relation to the merits, L&H urged the Court to decide whether the treatment of the Dictaphone Merger Claims should be "determined exclusively by this Bankruptcy Court in accordance with the Bankruptcy Code" based on whether there was "repugnance" between Belgian and U.S.

law. If there was no repugnance, L&H contended, the Court should determine which country was the "center of gravity" of the transactions.

The Bankruptcy Court heard oral argument on L&H's motion and issued a ruling from the bench. It defined the "crux of the argument" as "whether principles of international comity should operate to preclude this Court from imposing the impact of [its May 2001 determination that Stonington's claims were subject to subordination]. And, to allow Stonington to continue to pursue in Belgium, not only the assertion of its claim, but also the matter of its treatment under any Belgian Concordat reorganization process [sic]." Citing Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.) , 93 F.3d 1036 (2d Cir. 1996), the Court determined that there was a "true conflict" and that the United States was the "center of gravity." Its response was to grant "not only declaratory relief but injunctive relief against Stonington, directing Stonington not to pursue the argument in the Belgian Concordat proceedings."

After the hearing, L&H submitted a proposed order-- whose language the Court ultimately adopted -- acknowledging in the accompanying letter that the order provided for both a declaration and an injunction. The Bankruptcy Court entered the order, which read as follows:

> 1. The motion is hereby granted in its entirety.
>
> 2. The priority, treatment, and classification of the Dictaphone Merger Claims (as defined in the Motion) are matters to be determined exclusively by the Bankruptcy Court in accordance with the Bankruptcy Code.
>
> 3. Stonington is hereby immediately enjoined from further prosecuting the issue of the priority, treatment, and classification of the Dictaphone Merger Claims in Belgium under Belgian law.

The District Court affirmed this order essentially for the reasons given by the Bankruptcy Court, and Stonington

filed a timely appeal.

## III. Discussion

We note at the outset that the task facing a court in this factual and legal setting is, to say the least, difficult. In fact, it has been called a "Herculean task" to do what is required here -- namely, to "accommodat[e] conflicting, mutually inconsistent national regulatory policies while minimizing the amount of interference with the judicial processes of other nations." Laker Airways Ltd. v. Sabena, 731 F.2d 909, 214 (D.C. Cir. 1984). We undertake our analysis with a degree of empathy for courts called upon to make decisions in complex proceedings such as these, in an amorphous area of the law such as this one, and especially in high stakes, fast moving bankruptcy proceedings.

On appeal, Stonington argues primarily that the Bankruptcy Court entered an "anti-argument" injunction that impermissibly interfered with foreign proceedings, and that the Bankruptcy Court inappropriately applied to this situation the choice-of-law analysis employed by the Court of Appeals for the Second Circuit in Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.), 93 F.3d 1036 (2d Cir. 1996). In response, L&H endorses the application of Maxwell to these circumstances and contends that the Bankruptcy Court correctly determined that there is a "true conflict" and that the United States is indeed the "center of gravity" of the transactions. It further argues that, even if this were an anti-suit injunction, it was appropriately entered here to protect the Bankruptcy Court's jurisdiction and the important public policies underlying United States bankruptcy law.

Despite the parties' and the courts' focus on a"choice-of-law" analysis and their reliance on Maxwell , we conclude that the fashioning of relief in this situation does not merely call for a choice between United States and Belgian law as applicable to the priority of Stonington's claims in the Delaware bankruptcy proceedings. It requires more. In our view, the Bankruptcy Court did not simply make a "choice-of-law determination," but also imposed an "anti-suit injunction," calling for the application of specific legal precepts developed by our court. We will address each

aspect of its ruling in turn, first addressing the anti-suit injunction, and then considering whether the Bankruptcy Court employed the proper choice-of-law analysis.

## A. Anti-Suit Injunction

The portion of the Bankruptcy Court's order enjoining

Stonington "from further prosecuting the issue of the priority, treatment, and classification of the Dictaphone Merger Claims in Belgium under Belgian law" amounts to an anti-suit injunction. It ordered Stonington to pursue the key issues relevant to the allowance of its claim, and impacting directly the amount it would be paid, in Delaware Bankruptcy Court, and not to pursue them in Belgium. We have often said that enjoining a party from resorting to a foreign court is equivalent to enjoining foreign proceedings. See, e.g., Compagnie des Bauxites de Guinea v. Insurance Co. of N. America, 651 F.2d 877, 887 (3d Cir. 1981) (finding "no difference between addressing an injunction to the parties and addressing it to the foreign court itself ").3 Further, although the Bankruptcy Court and Stonington urge us to consider it an "anti-argument" injunction rather than an "anti-suit" injunction,4 we view this as a distinction without a difference in the factual setting presented.

A number of our opinions address the standards governing entry of an anti-suit injunction. They typically have arisen in the international arena, where considerations of comity come into play. Based on a "serious concern for comity," we have adopted a restrictive

_____

3. L&H attempts to distinguish Compagnie des Bauxites on the ground that there we acknowledged the district court's power to issue such injunctions. But, while true, it is beside the point. We have acknowledged the district court's power to enjoin foreign actions, but this says nothing about the standards that guide courts when they exercise that power, nor does it indicate whether enjoining a party is the equivalent of enjoining a foreign proceeding.

4. The Bankruptcy Court differentiated between whether Stonington could file a proof of claim and participate in the Belgian proceedings, which it had previously stated Stonington could do, and whether Stonington could litigate the treatment of its claim. It disclaimed any "attempt to control [the Belgian Concordat] or an attempt to trump the decisions made in that forum."

10

approach to granting such relief. General Elec. Co. v. Deutz AG, 270 F.3d 144, 161 (3d Cir. 2001). And, we have described international "comity" as the "recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another . . . [that] should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1972); see also Hilton v. Guyot, 159 U.S. 113, 163-64 (1895). The principles of comity are particularly appropriately applied in the bankruptcy context because of the challenges posed by transnational insolvencies and because Congress specifically listed "comity" as an element to be considered in the context of such insolvencies, albeit in relation to ancillary proceedings. See 11 U.S.C. S 304; Maxwell Communication Corp. v. Societe Generale (In re Maxwell

Communication Corp.), 93 F.3d 1036, 1048 (2d Cir. 1996); Remington Rand Corp. v. Business Sys. Inc., 830 F.2d 1260, 1271 (3d Cir. 1987).

These principles animate our jurisprudence in this area. In General Electric Co. v. Deutz AG, the district court had enjoined the defendant "from applying to English courts to enforce the alleged right to arbitration." 270 F.3d 144, 148 (3d Cir. 2001). On appeal, we noted that the federal courts of appeals had developed two different standards, one "liberal" and the other "restrictive," for determining when to enjoin foreign proceedings, and we concluded that our jurisprudence endorsed the restrictive approach. 5 Id. at 160-61; see also Republic of the Philippines v. Westinghouse

---

5. In General Electric, we contrasted the"lax" or "liberal" approach of the courts of appeals for the Fifth, Seventh, and Ninth Circuits with the "restrictive" approach adopted by the courts of appeals for the Second, Sixth, and District of Columbia Circuits. Compare Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 626-28 (5th Cir. 1996) ("lax" standard); Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 10 F.3d 425, 431-32 (7th Cir. 1993) (same); and Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League, 652 F.2d 852, 855-56 (9th Cir. 1981) (same); with Gau Shan Co. v. Bankers Trust Co., 956 F.2d 1349, 1354-58 (6th Cir. 1992) ("restrictive" approach); China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987) (same); and Laker Airways, 731 F.2d at 937-45 (same).

11

Elec. Corp., 43 F.3d 65, 76 (3d Cir. 1994) (the power to enjoin a foreign action should "be exercised only in rare cases, and must be premised on a thorough analysis of the interests at stake"). Applying this approach, we reversed the grant of injunctive relief.

Likewise, in Compagnie des Bauxites de Guinea v. Insurance Co. of North America, 651 F.2d 877 (3d Cir. 1981), the district court had enjoined a party from maintaining an action filed in England. We reversed, reasoning that "[r]estraining a party from pursuing an action in a court of foreign jurisdiction involves delicate questions of comity and therefore 'requires that such action be taken only with care and great restraint'." Id. at 887 n.10 (quoting Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir. 1969)). We concluded that neither duplication of issues nor delay in filing justified such an injunction, and further noted that even the fact that a foreign action was "harassing and vexatious" would not, by itself, warrant injunctive relief.6 Id. at 887; see also Gau Shan Co. v. Bankers Trust Co., 956 F.2d 1349, 1357 (6th Cir. 1992) (if duplication were enough to justify an anti-suit injunction, "parallel proceedings would never be permitted because by definition such proceedings involve the same claim and therefore the same parties and issues").7

---

6. Here it would be difficult to say that the second action was "harassing

and vexatious" as L&H pursued both actions.

7. In General Electric, the injunction at issue prevented the party from filing proceedings and, in Compagnie des Bauxites, it prevented a party from maintaining a proceeding that had already been filed. Here, in contrast, the two courts have issued conflicting rulings. There may be a difference between pre- and post-judgment anti-suit injunctions. See, e.g., Laker Airways, 731 F.2d at 926-27 ("[P]arallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other."); cf. Ingersoll Milling Mach. Co. v. Granger, 833 F.2d 680, 684 (7th Cir. 1987) (noting the importance of procedural posture in the anti-suit injunction context). See generally BORN, GARY B., INTERNATIONAL CIVIL LITIGATION IN UNITED STATES COURTS 489 (3d ed. 1996). But neither party argues that the May 2001 order of the Bankruptcy Court or the Belgian court's rejection of L&H's proposed

12

Courts that, like us, adopt the restrictive approach to enjoining foreign proceedings acknowledge that courts may enter an anti-suit injunction on the rare occasions when needed "to protect jurisdiction or an important public policy." General Elec., 270 F.3d at 161; see also Laker Airways, 731 F.2d at 927. They have interpreted these exceptions narrowly. In Laker Airways, for instance, the Court of Appeals for the District of Columbia Circuit approved an anti-suit injunction where the foreign defendants initiated the foreign proceeding for the "sole purpose of terminating the United States claim" and where the foreign court had enjoined parties from pursuing an action in the United States. Id. at 915. The foreign proceeding threatened United States jurisdiction in that it "attempt[ed] to carve out exclusive jurisdiction over concurrent actions." Id. at 930.

Few cases have addressed a situation in which an anti-suit injunction has been appropriately entered to protect important public policy, but the courts that take a restrictive approach have referenced this exception as being narrowly drawn. In Gau Shan Co., the Court of Appeals for the Sixth Circuit noted that "there is very little case law on the magnitude of the importance of public policy considerations to the decision whether to permit an antisuit injunction," but concluded that "only the evasion of the most compelling public policies of the forum will support the issuance of an antisuit injunction" and that the state-law treble damages remedy at issue there did not rise to that level. 956 F.2d at 1357. Notably, the policies that the Laker Airways court found to justify an anti-suit injunction

---

plan can be pled as res judicata in the other proceeding. Stonington contends that "neither court has actually issued an order directing the disposition of the estate's assets," and L&H states that "the Belgian Court never was presented with or ruled upon the question of the law properly applicable to the 'treatment' of Stonington [sic] claims." Further, in the May 2001 hearing, debtor's counsel stated that "I don't think we'll

argue that [an order that Stonington's claims be subordinated] is res judicata. I don't think we can argue that." So, we consider our cases that address the standards for enjoining on-going proceedings to be appropriately applied in this situation.

were not those motivating United States antitrust laws -- the substance of the dispute -- but instead "that United States judicial functions have been usurped, destroying the autonomy of the courts." Laker Airways, 731 F.2d at 939. This is significant because, rather than focus on the public policies furthered by the substantive law, which presumably are always present, at least to some degree, the court focused on what made this case unusual -- namely, the degree of foreign interference with properly invoked United States concurrent jurisdiction.

L&H urges us to find that the situation before the Bankruptcy Court fit into either or both of these narrow exceptions. Clearly jurisdiction is not implicated in the way it was in Laker Airways. Not only is there no indication that the Belgian proceeding's sole purpose was to deprive the United States court of its jurisdiction,8  but also L&H, rather than Stonington, had initiated the foreign proceeding. L&H tries to sidestep this problem by claiming that the basis of the Bankruptcy Court's jurisdiction is in rem , a circumstance in which courts have been willing to enjoin foreign proceedings. E.g., Gau Shan Co. , 956 F.2d at 1356. L&H relies on an opinion of the Court of Appeals for the Ninth Circuit that interpreted 28 U.S.C. S 1334(e) as giving district courts in which bankruptcy cases are brought "exclusive in rem jurisdiction over all of the property in the estate." In re Simon, 153 F.3d 991, 996 (9th Cir. 1998). If this is a controlling principle, it would seem that anti-suit injunctions would always be appropriate in the bankruptcy context, which surely is not consistent with our anti-suit injunction jurisprudence or the acknowledged importance of comity concerns in transnational insolvencies.

L&H also argues that an anti-suit injunction is warranted to protect the "integrity of the U.S. claims allowance and distribution scheme" embodied in section 510(b). Again,

---

8. One of the reasons given by the Court of Appeals for the D.C. Circuit for approving the anti-suit injunction entered in Laker Airways was that the suits were not "parallel proceedings" because the parties filed the foreign suit not to establish concurrent proceedings on the same dispute, but rather simply to terminate the U.S. action. In contrast, here the two insolvency proceedings are parallel in the normal sense of the term.

this is an argument for the Bankruptcy Court to consider on remand, but we note that, if indeed Stonington was induced to take equity through fraud, this might dilute L&H's argument that subordinating Stonington's claims

promotes an important public policy. Nothing before us indicates that the Dictaphone Merger Claims, although they resulted from the sale of equity and have been ruled to be technically subject to 510 subordination, are not in fact valid, cognizable claims that some public policy might support treating pari passu with trade creditors.

In addition to its arguments based on our anti-injunction cases, Stonington further challenges the entry of an injunction on several more fundamental grounds. It objects that Federal Rule of Civil Procedure 65's irreparable injury requirement was not complied with. In response, L&H urges that the Bankruptcy Court appropriately exercised its discretion under section 105(a) of the Bankruptcy Code, 11 U.S.C. S 105(a), and complied with the relevant requirements. In our cases considering anti-suit injunctions, we have not specifically evaluated irreparable injury and other Rule 65 requirements, but instead reached only the threshold requirements unique to anti-suit injunctions, namely comity concerns, which we view as more restrictive than the general requirements of Rule 65. See, e.g., Compagnie des Bauxites, 651 F.2d 877; Laker Airways, 731 F.2d 909. But see Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir. 1996) (analyzing the grant of the anti-suit injunction and whether there was compliance with Rule 65). We think that if the requirements for an anti-suit injunction are met, these supplant the need for proof under Rule 65. Here, the requirements of neither were shown.

Stonington further argues that the Bankruptcy Court erred in issuing injunctive relief absent a request by the debtor. As we noted above, L&H's motion requested declaratory relief only and there was no discussion of the standards for granting such injunctive relief in the briefing before the Bankruptcy Court. We view the fact that the debtor appears to have requested only declaratory relief, and never an injunction, to significantly undermine the basis for entry of the order.

15

Given that our case law unequivocally directs courts to exercise restraint in enjoining foreign proceedings, we are skeptical as to whether an anti-suit injunction can be found to be appropriate in these circumstances. Judge Rosenn believes that it cannot. Nonetheless, we believe it appropriate for the Bankruptcy Court to consider in the first instance the application of the principles we have discussed and the interplay of the various comity concerns that were not previously the focus of its attention. We are privy to only a snapshot of the bankruptcy case and believe that the type of qualitative analysis we advocate would be best conducted from the more expansive vantage point of the bankruptcy judge. Further, the parties have focused on certain facts, and there may be others not known to us that could impact on this ruling. Accordingly, we will remand for the Bankruptcy Court to apply the approach to anti-suit injunctions that has been developed in our court and to

consider comity concerns in deciding whether this is one of the rare situations in which such relief is appropriate.

Before leaving this subject, we note that we cannot agree with L&H or the Bankruptcy Court that Maxwell is controlling on this issue. In Maxwell, the Court of Appeals for the Second Circuit affirmed the dismissal of the action before it in favor of the English court. To reach its decision, the court determined which law should be applied to the particular question.9 It concluded that there was a "true conflict" between English and United States law regarding the "debtor's ability to set aside pre-petition transfers to certain creditors," and then evaluated the connection of England to the disputes, the relative policy interests of the United States and England, and, finally, the systemic interest in a coordinated and harmonious distribution of assets. Maxwell, 93 F.3d at 1049-53. Because it concluded that English law applied, it affirmed dismissal in favor of the English proceedings.

_____

9. We refer to Maxwell's analysis primarily as a "choice of law" analysis because most of the opinion is devoted to determining whether English or United States law should apply. But the lines between choice of law and choice of forum are not always easily drawn. The court acknowledged that both choice-of-law and choice-of-forum questions generated the litigation, and, by affirming the dismissal of the case in favor of the English courts, the court effectively chose the forum.

16

Notwithstanding each party's reliance on the Maxwell case, all that was determined in Maxwell was that the district court had not abused its discretion in dismissing the debtor's complaint for avoidance of preferential transactions in deference to the courts and the laws of England. There was no suggestion that, had the court been unwilling to dismiss the complaint, it would, in addition, have enjoined the parties or party from pursuing claims in England. Although both implicate comity concerns, there is a difference between staying or dismissing one's own proceedings because of a foreign proceeding or judgment, and enjoining those foreign proceedings. Cf. Laker Airways, 731 F.2d at 931 (stating that "[e]njoining participation in a foreign lawsuit in order to preempt a potential judgment is a much greater interference with an independent country's judicial processes" than refusing to enforce a judgment); Gau Shan Co., 956 F.2d at 1355 (distinguishing between the analysis of a motion for dismissal on forum non conveniens grounds, which might appropriately include consideration of "vexatiousness," and a motion for a foreign anti-suit injunction). Maxwell does the former after engaging in a choice-of-law analysis. This is simply not a good "fit" with the injunction context here, to which our anti-suit injunction case law discussed above most appropriately applies.

B. Choice-of-Law Analysis

Maxwell also served as the fulcrum for the Bankruptcy Court's choice-of-law analysis. Insofar as the Court was being called upon to determine which law applied to Stonington's claims in Delaware, deciding whether, for purposes of the Plan of Reorganization in the Delaware bankruptcy proceedings, subordination of those claims, or no subordination of those claims, is the rule,[10] it

10. Technically, preventing Stonington from pursuing its claims "in Belgium under Belgian law" may leave open the possibility that it could pursue its claims in Belgium under United States law. And in some ways, the order does force the Belgian court to apply U.S. law to the treatment of Stonington's claims through the anti-suit injunction. However, in granting L&H's motion, the Bankruptcy Court specifically said that it was not dictating the law the Belgian court should apply in the Belgian proceedings. Further, L&H specifically disclaimed any intention of having the Bankruptcy Court "dictate how claims will be treated in the Belgian Proceeding" and, in fact, said that the Bankruptcy Court lacked the power to do so.

17

appropriately applied the choice-of-law considerations outlined in Maxwell. However, we fear the Bankruptcy Court's "center of gravity" analysis falls short of what is required in this factual setting, and what Maxwell teaches, given the notions of comity that must be considered. As in Maxwell, the Court here determined that there was a "true conflict"[11] and then examined the transactions at issue and the connections of the parties in order to assess the most "connected" locale or jurisdiction. Here, based upon the transactions leading to the Dictaphone Merger Claims, that jurisdiction was found to be Delaware. In Maxwell, it was found to be England.

However, that is not, and was not in Maxwell, the end of the analysis. Rather, the heart of the inquiry in Maxwell involved the court's assessment of the nature of the respective countries' policies and the principles animating the laws, so as to determine which country actually had a stronger interest in its policy's being advanced. The court considered the strength of the policies underlying the Bankruptcy Code's avoidance provisions and concluded that the policies of "equal distribution to creditors and preserving the value of the estate" were effectuated by the English equivalent. Maxwell, 93 F.3d at 1052. To make this determination, it relied on the detailed exposition of the two countries' laws and policies in the bankruptcy court opinion below. The court also noted that the strong English connection to the transactions implied England's strong interest in applying its law, and also suggested that it was foreseeable that English law would be applied. Id. Finally, it examined which choice of law would further the "systemic

11. Stonington urges that there was not, or at least not yet, a "true conflict" that would trigger a comity analysis, but we agree with the Bankruptcy Court that a true conflict existed. See Maxwell, 93 F.3d at

1050 ("[A] conflict between two avoidance rules exists if it is impossible to distribute the debtor's assets in a manner consistent with both rules.").

Some language in the Bankruptcy Court's oral opinion suggests that the relevant conflict is between the parties rather than between the laws. As the relevant conflict is between United States and Belgian law, this issue may need to be revisited and clarified on remand.

interest" in "smoothly functioning international law." Id. at 1053.

The type of examination, then, requires more than an analysis of contacts. It requires, in addition, a qualitative assessment that can only occur if there is some understanding, and explication, of the way in which the allowance, or subordination, of the claims at issue would advance or detract from each nation's policy regarding insolvency proceedings and distributions to creditors. For instance, the Bankruptcy Court should consider the strength of the United States' interest in applying its bankruptcy laws and, specifically, its subordination rules in these circumstances. The policies generally furthered by subordination may be less compelling here if Stonington was induced to enter a merger agreement, and become an equity holder, by fraud. The Bankruptcy Court should also consider the countervailing Belgian subordination rules and underlying policies, which are mentioned, but not developed, in the record. This discussion was not present in the Bankruptcy Court's consideration here and should be undertaken when the Bankruptcy Court engages in a choice-of-law determination.

C. Law of the Case, Waiver, and Estoppel

Stonington makes several additional arguments on appeal: that the Bankruptcy Court's order violates the law of the case and that L&H's argument that U.S. law governs distribution in the Belgian proceeding is estopped and waived.

Stonington urges that the Bankruptcy Court's order violates the law of the case doctrine. Specifically, it contends that the Bankruptcy Court, having repeatedly recognized Stonington's right to proceed in the Belgian reorganization proceedings, file a proof of claim, and otherwise participate, cannot now order that Stonington should not be permitted to do so. We recognize, however, that the Bankruptcy Court's previous reflections on Stonington's ability to pursue its claims were not uttered in the same context as the ruling we review.12 Accordingly, we

12. In December 2000, the Bankruptcy Court said that Stonington was "absolutely right in the -- contention that[it] must be permitted to

do not think that the Bankruptcy Court's previous references to Stonington's right should serve as an automatic bar, or law of the case, regarding its consideration of an anti-suit injunction and conflict of laws issue.

Further, Stonington argues that the debtor's failure to appeal the allowance of Stonington's claims in the Belgian proceeding and the Belgian court's rejection of the debtor's proposed plan (which contained a subordination provision) constitute a waiver of its right to assert that Stonington should not be allowed to pursue its claims in Belgium under Belgian law. Stonington also urges that L&H has taken the position that Stonington can pursue all pre-petition claims other than "penalties" in the Belgian proceeding.13 While we do not view this conduct as creating a bar, nonetheless we would urge that the Bankruptcy Court, as a court of equity, consider L&H's conduct in its overall assessment of the issues before it. Especially relevant are the facts that: the debtor sought relief in the Belgian court; pursued a plan in that court; and, when faced with an adverse ruling, did not appeal it, but instead sought refuge from the Belgian court in the United States. To the extent that the Bankruptcy Court views these aspects as having bearing on the equities, it should include them in its ruling.

---

participate in the Belgian reorganization proceedings." The Court made this statement while deciding the effect of the automatic stay on the Belgian order to deposit Dictaphone shares with a court-appointed trustee. It reiterated that Stonington was specifically permitted to file its pre-petition claims in Belgium and that to preclude it "would be problematic" in the context of the April 2001 hearing on a motion to enjoin Stonington from pursing penalties in Belgium. Even in the hearing on the motion that gives rise to this appeal, the Bankruptcy Court repeated its prior statement that Stonington could participate in the Belgian Concordat.

13. As noted above, the Belgian court had ordered L&H to deposit the Dictaphone stock with a court-appointed trustee. It imposed penalties for each day that L&H failed to comply with this order. In seeking an order from the Delaware Bankruptcy Court enjoining Stonington from pursuing these penalties in Belgium, L&H stated that"Stonington should . . . have 'full access' to the Belgian Concordat Court, but only for the purpose of proving its pre-petition claims."

20

D. Duplicate Proceedings

Situations such as this call out for coordination of the two plenary proceedings. The parties have alluded to, and we are aware of, the ability of courts to discuss and ultimately agree upon an amicable resolution of these types of issues by way of an understanding or "protocol" that becomes a governing instrument by agreement. Maxwell

was the "poster" case for how courts can work together when dual proceedings take place, and other courts have followed suit. E.g., In re Ionica PLC , 241 B.R. 829 (Bankr. S.D.N.Y. 1999); In re Commodore Int'l Ltd., 242 B.R. 243 (Bankr. S.D.N.Y. 1999), aff 'd, 2000 WL 977681 (S.D.N.Y. July 17, 2000). In Maxwell, a protocol was established -- "a plan of reorganization and a scheme of arrangement, which are interdependent documents and were filed by the administrators in the United States and English courts respectively" -- that was praised as " '. . . perhaps the first world-wide plan of orderly liquidation ever achieved'." Maxwell, 93 F.3d at 1042 (quoting Jay Lawrence Westbrook, The Lessons of Maxwell Communication, 64 Fordham L. Rev. 2531, 2535 (1996)).

The parties have indicated that such a protocol was attempted but was not achievable in the instant situation, although the record is somewhat sparse on this issue.[14] There are references to things done or said by the Belgian court, but no references to any specific attempt-- by the parties or by the Bankruptcy Court -- to bridge the gap between them. Instead, counsel complains that the debtor faces "an impossible situation" -- that we must suggest is of the debtor's own making -- while the Bankruptcy Court assumed at one point that the "Catch-22" will be worked out through negotiation, and indicated that such coordination should be initiated by the debtor.

We strongly recommend, in a situation such as this, that an actual dialog occur or be attempted between the courts of the different jurisdictions in an effort to reach an

---

14. Our request that the parties supplement the briefing on this issue resulted only in citations to comments by counsel at various oral arguments and to the plan L&H had submitted to the Belgian court, which purportedly included a "protocol-like provision."

21

agreement as to how to proceed or, at the very least, an understanding as to the policy considerations underpinning salient aspects of the foreign laws. Maxwell provides a good example. There, the Court of Appeals for the Second Circuit attributed the "high level of international cooperation and a significant degree of harmonization of the laws of the two countries" in large part to "the cooperation between the two courts overseeing the dual proceedings." Maxwell, 93 F.3d at 1053. While we do not know whether the cooperation there was initiated by the court or the parties, there is no reason that a court cannot do so, especially if the parties (whose incentives for doing so may not necessarily be as great) have not been able to make progress on their own. See generally BUFFORD, SAMUEL L., ET AL., INTERNATIONAL INSOLVENCY 93 (Federal Judicial Center 2001) (recommending that judges communicate with each other in transnational cases). In Maxwell, the court suggested that"bankruptcy courts may best be able to effectuate the purposes of the bankruptcy law by cooperating with foreign courts on a

case-by-case basis." Id. Even if cooperation could not be achieved, it would be valuable to communicate regarding the policies animating a certain law so as to be better able to perform a choice-of-law analysis. While not required by our case precedent or any principle of law, we urge that, in a situation such as this, communication from one court to the other regarding cooperation or the drafting of a protocol could be advantageous to the orderly administration of justice.

IV. Conclusion

For the reasons above, we will REVERSE the District Court's judgment and REMAND to the District Court for it to remand, in turn, to the Bankruptcy Court for further proceedings consistent with this opinion.

22

ROSENN, Circuit Judge, Concurring:

I agree with the majority that the Bankruptcy Court's improvident grant of injunctive relief against Stonington Partners, Inc. (Stonington) must be reversed. Lernout & Hauspie Speech Products, N.V. (L&H) neither sought the injunction, nor did it fulfil any of the procedural requirements to obtain an injunction. I also agree with the majority's recommendation that the Delaware and Belgian bankruptcy courts should engage in a dialogue in an effort to develop a protocol for the cooperation of the two courts in overseeing and harmonizing the dual proceedings so as to effectuate the orderly administration of justice. I write separately, however, because I see no basis or necessity for remanding this proceeding to the Delaware Bankruptcy Court.

Despite the absence of any request by L&H for injunctive relief and even though "our case law unequivocally directs courts to exercise restraint in enjoining foreign proceedings," (maj. op. at 16), the majority remands the case to the Bankruptcy Court "to apply the approach to anti-suit injunctions that has been developed in our court and to consider comity concerns in deciding whether this is one of the rare situations in which such relief is appropriate." Id. Such a remand to the Bankruptcy Court and for such purpose is inexplicable in the circumstances of this case and in the absence of any request by L&H for injunctive relief and its failure to comply with injunctive procedural requirements.

These proceedings never required a choice-of-law analysis. The issue did not arise in the context of an ancillary proceeding commenced in the United States in aid of a foreign proceeding or in the context of a request to the United States court to abstain or dismiss in deference to a plenary foreign proceeding under 11 U.S.C. S 305. Here, L&H, a corporation organized under the laws of Belgium, voluntarily commenced a plenary bankruptcy reorganization proceeding in Belgium and a separate

bankruptcy proceeding in Delaware. Both of these bankruptcy proceedings followed on the heels of Stonington's action against L&H and certain of its former officers and directors, all of whom have been arrested and

jailed in Belgium on charges of securities fraud, to set aside L&H's acquisition of the Dictaphone Corporation from Stonington because of the perpetration of fraud. A few days before L&H filed its bankruptcy petition, the Belgian court ordered L&H to turn over its shares of Dictaphone to a court-appointed trustee.

Neither the Belgian court nor the Delaware Bankruptcy Court has declined to exercise jurisdiction over any part of the case. Under such circumstances, it would be an abuse of discretion for the Bankruptcy Court or the District Court to enjoin the presentation of a claim in the court of another sovereign. I see no factors here that justify the breach of comity among the courts of separate sovereignties. See Compagnie des Bauxites de Guinea v. Insurance Co. of North America, 651 F.2d 877, 887 (3d Cir. 1981). In fact, on December 4, 2000, the Bankruptcy Court informed counsel for Stonington in open court that "you're absolutely right in the contention that you must be permitted to participate in the Belgian reorganization proceedings."

I see nothing about this case that commands a choice-of-law analysis, particularly in light of the Bankruptcy Court's acknowledgment that if it were to give direction to the Belgian court what or what not to do, "that would be violative of international comity principles and the like." Yet, the majority remands this case to the Bankruptcy Court to undertake another choice-of-law analysis to determine whether it should enjoin Stonington from pursuing rights granted to it under foreign law in a proceeding that L&H initiated in the foreign court. The reasons given for the remand are vague and lack substance: to consider "the application of the principles" the majority has discussed and "the interplay of the various comity concerns" on which the Bankruptcy Court failed to focus its attention, or to search for facts "not known to us that could impact on the ruling." (Maj. op. at 16). These are indeed slender reeds on which to empower another effort in the Bankruptcy Court to enjoin Stonington's participation in the Belgian proceedings, especially when the record on the issue before us is sufficient and the legal principles are well-established.

The other anomaly produced by the remand to the Bankruptcy Court is that it discourages and burdens the loss-recovery effort of Stonington, an American ERISA fiduciary that manages institutional capital on behalf of public and corporate pension funds, and private endowments, before a Belgian court that is ready and

willing to entertain its claim. Furthermore, were the Bankruptcy Court again to issue an injunction after another choice-of-law analysis, it would, in effect, challenge the dignity and sovereignty of the Belgian court and the outcome of the proceedings before it, an act of hostility rather than comity. To rationalize that the Bankruptcy Court's preclusion of Stonington from presenting its claim does not diminish the authority or jurisdiction of the foreign court is sophistry. "[T]here is no difference between addressing an injunction to the parties and addressing it to the foreign court itself." 651 F.2d at 887.

L&H, a corporation organized under Belgian laws, voluntarily sought the protection of the Belgian courts. Stonington did not initiate these proceedings in that court; L&H did. Stonington did not seek protection under Belgian law; L&H did. Remanding the case to the Bankruptcy Court for another opportunity to attempt to shore up a case for injunctive relief is inappropriate because L&H never sought an injunction in the first place, and it disregards the equities of the parties and the principles of international comity. Furthermore, it is contrary to our case law, which "unequivocally directs courts to exercise restraint in enjoining foreign proceedings." (Maj. op. at 16) It ignores the majority's skepticism, which I share, "as to whether an anti-suit injunction can be found to be appropriate in these circumstances." Id. It runs counter to the Bankruptcy Court's ruling, repeated at the hearing on April 10, 2001, that "it was well established [on February 8th] and well understood that Stonington could pursue its claim in the concordat."

Therefore, this case should not be remanded to the Bankruptcy Court for further consideration on the appropriateness of injunctive relief.

25

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

26