### In re DOW CORNING CORPORATION, Debtor.

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Dec. 1, 1999.

See also 244 B.R. 718; 244 B.R. 634; 244 B.R. 673; 244 B.R. 678; 244 B.R. 705; 244 B.R. 721.

Barbara J. Houser, George Tarpley, Craig J. Litherland, David Bernick, David

Ellerbe, Sheinfeld, Maley & Kay, P.C., for Debtor.

Ogden N. Lewis, Michael S. Flynn, Davis Polk & Wardwell, Sheryl L. Toby, Honigman, Miller, Schwartz & Cohn, for the Official Committee of Unsecured Creditors.

Ralph R. Mabey, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Robert S. Hertzberg, Hertz, Schram & Saretsky, P.C., for Halcyon.

Charles Wolfson, for Certain New Zealand Claimants.

David J. Hutchinson, Fernando Vergueiro, for Brazilian Claimants.

John White, Jr., Geoffrey White, for Class 5 Nevada Claimants.

Kenneth H. Eckstein, Jeffrey S. Trachtman, Kramer Levin Naftalis & Frankel LLP, for the Official Committee of Tort Claimants.

Mark Phillips, H. Jeffrey Schwartz, for Official Committee of Physicians Claimants.

Glenn Gillette, for the United States Government.

Sybil Shainwald, Stephen H. Weiner, for Foreign Claimants.

John T. Johnson, P.C., for Certain Claimants from The Netherlands.

Peter Cashman, David Goroff, for Australian Claimants.

Leslie K. Berg, Office of the U.S. Trustee.

### AMENDED OPINION REGARDING CRAMDOWN ON CLASS 18

ARTHUR J. SPECTOR, Chief Judge.

The Debtor and the Official Committee of Tort Claimants negotiated and on November 9, 1998 filed a Joint Plan of Reorganization. The plan (hereafter referred to simply as the "Plan") was subsequently amended on February 4, 1999 and modified various times. The hearing on confir-

mation of the Plan commenced on June 28, 1999 and closing arguments were heard on July 30, 1999. Several post-hearing briefs and other submissions were received and the Court took the matter under advisement.

On this date the Court issued its Findings of Fact and Conclusions of Law on the matter of the confirmation of the Plan. This opinion is one of several which will serve to supplement and explicate some of the findings and conclusions. At least one opinion will follow later.

A general overview of the Plan's terms is contained in the opinion on classification and treatment issues. When necessary, additional Plan terms are explained here. Except when otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

Pursuant to 11 U.S.C. § 1129(b)(1), the Proponents seek to cram down the Plan on the rejecting Class 18, composed of impaired claims of the Norplant© long term contraceptive implant ("LTCI") personal injury claimants. The Plan was rejected by Class 18. The Court concludes that the Plan is fair and equitable and does not discriminate unfairly against Class 18, and thus, the requirements for cramdown as to this class are met.

## I. *Facts*

The manufacturers and/or distributors of LTCI products, American Home Products Corporation ("AHP") and Leiras Oy entered into indemnity contracts and related guaranty agreements with the Debtor under which they agreed to indemnify the Debtor against all LTCI claims asserted against it. *See Confirmation Hearing Final Pre–Trial Order ("Final Pre–Trial Order")*, Part IV, Uncontested Fact 5, p.

12. The broad definition of "LTCI claims" in these contracts clearly encompasses the LTCI personal injury claims in Class 18. *See Plan*, § 1.93. The Plan provides that the Debtor, with the consent of AHP and Leiras Oy, will assign its rights under the indemnity and guaranty contracts to the Litigation Facility. *See Final Pre–Trial Order*, Part IV, Uncontested Fact 6, p. 12; *Transcript*, July 30, 1999 (statement of Barbara Houser, counsel for Dow Corning Corp.), p. 80. The Plan provides further that all Class 18 "LTCI [p]ersonal injury [c]laims will be channeled to [the] Litigation Facility and treated through enforcement of indemnity agreements assigned by the Debtor to the Litigation Facility." *Amended Joint Disclosure Statement with Respect to Amended Joint Plan of Reorganization of Dow Corning Corporation*, p. 19; *see also Plan*, § 5.14 ("The sole remedy available to Class 18 and 19 Claimants shall be the Litigation Facility's enforcement of the LTCI Indemnities."). Class 18 voted to reject the Plan because although the majority of the class voted to accept the Plan, its votes did not equal the "two-thirds in [dollar] amount ... of the allowed claims of [that] class" required under § 1126(c)[1] for the Plan to be accepted. No member of Class 18 filed any written objections to the Plan or appeared or voiced any objections at the confirmation hearing.

## II. *Discussion*

If all of the requirements of § 1129(a) are met except subsection (a)(8), the Bankruptcy Code allows confirmation of a debtor's plan, even though an impaired class of unsecured claims has rejected it, upon a finding that it does not "discriminate unfairly" against the dissent-

---

**1.** Section 1126(c) provides:
(c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of

this section, that have accepted or rejected such plan.
11 U.S.C. § 1126(c). Out of the 4,827 total ballots cast by Class 18 members, 2,583 ballots (representing 53.5% of the total) were cast in favor of accepting the Plan, while 2,244 ballots (representing 46.5% of the total) were in favor of rejecting the Plan.

ing classes of creditors and is "fair and equitable." 11 U.S.C. § 1129(b)(1); *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 531–32 (Bankr.E.D.Tenn.1997). Section 1129(b)(1) provides:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).[2] The Proponents have the burden of proving all of the elements of § 1129(b)(1) by a preponderance of the evidence. *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 479 (Bankr.E.D.Mich. 1995). The Proponents have satisfied this burden.

## A. *Unfair Discrimination Prong*

■ Under § 1129(b)(1), the Plan can permissibly discriminate against a non-accepting impaired class in distributing the reorganization surplus as long as the discrimination is fair. *See Crosscreek*, 213 B.R. at 537; 7 *Collier on Bankruptcy*, ¶ 1129.04[3], at 1129–70 (15th ed. rev.1999).

---

2. In a series of separate opinions, the Court decided that the Plan satisfies the relevant § 1129(a) requirements.

3. Prior to *Aztec*, cases applying this four-part test in deciding the § 1322(b)(1) unfair discrimination issue included: *In re Blackwell*, 5 B.R. 748, 751 (Bankr.W.D.Mich.1980); *In re Kovich*, 4 B.R. 403, 407 (Bankr.W.D.Mich. 1980); *In re Hosler*, 12 B.R. 395, 396 (Bankr. S.D.Ohio 1981); *In re Dziedzic*, 9 B.R. 424, 427 (Bankr.S.D.Tex.1981); *In re Wolff*, 22 B.R. 510, 512 (9th Cir. BAP 1982); *Worthen Bank & Trust Company, N.A. v. Cook* (*In re Cook*), 26 B.R. 187, 190 (D.N.M.1982). *In re Perkins*, 55 B.R. 422, 426 (Bankr.N.D.Okla. 1985); *In re Bowles*, 48 B.R. 502, 506 (Bankr. E.D.Va.1985); and *In re Harris*, 62 B.R. 391, 393–94 (Bankr.E.D.Mich.1986) (citing these cases).

The Bankruptcy Code lacks any criteria or standards for determining whether a plan unfairly discriminates. For this reason, courts have formulated various tests to decide this issue. *Crosscreek*, 213 B.R. at 537; 7 *Collier on Bankruptcy*, ¶ 1129.04[3][a], at 1129–70–72.

### 1. *Unfair Discrimination Tests*

In *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr.M.D.Tenn.1989), the court employed a four-part analysis, borrowed from case law interpreting the unfair discrimination prohibition of § 1322(b)(1), to determine whether the purported discrimination in the debtor's plan was fair under § 1129(b)(1). The factors considered in *Aztec*, in light of the facts and circumstances presented, were:

> (1) whether the discrimination is supported by a reasonable basis;
>
> (2) whether the debtor can confirm and consummate a plan without the discrimination;
>
> (3) whether the discrimination is proposed in good faith; and
>
> (4) the treatment of the classes discriminated against.[3]

*Id.* Although many courts have applied the four-factor test in chapter 11 cases to decide the unfair discrimination issue,[4] some

---

4. *See* Denise R. Polivy, *Unfair Discrimination In Chapter 11:A Comprehensive Compilation of Current Case Law*, 72 Am. Bankr.L.J. 191, 225 n. 102 (1998) compiling the following cases which have applied the four-part test to determine the § 1129(b)(1) unfair discrimination issue: *In re Graphic Communications, Inc.*, 200 B.R. 143, 148 (Bankr.E.D.Mich.1996); *In re Zaleha*, 1995 WL 128495, *4 (Bankr.D.Idaho Mar. 10, 1995); *In re Stratford Assocs. L.P.*, 145 B.R. 689, 700 (Bankr.D.Kan.1992); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 715–16 (Bankr.M.D.Tenn.1992); *In re ARN Ltd. L.P.*, 140 B.R. 5, 13 (Bankr.D.D.C.1992); *In re Kemp*, 134 B.R. 413, 417 (Bankr. E.D.Cal.1991); *In re Mortgage Investment Co.*, 111 B.R. 604, 614–15 (Bankr.W.D.Tex.1990); *Creekstone Apts. Assocs., L.P. v. Resolution Trust Corp.* (*In re Creekstone Apts. Assocs., L.P.*), 168 B.R. 639, 644–45 (Bankr.M.D.Tenn. 1994); *In re Apex Oil Co.*, 118 B.R. 683, 711

courts, finding its elements redundant, have pared it down to one or two factors.[5] Other courts have preferred a flexible analysis not tied to any indispensable elements but based on the facts and circumstances in a particular case. *See Crosscreek*, 213 B.R. at 537 (discussing various approaches courts have used in deciding the § 1129(b)(1) unfair discrimination issue); *see also* Denise R. Polivy, *Unfair Discrimination In Chapter 11: A Comprehensive Compilation of Current Case Law* (*"Unfair Discrimination in Chapter 11"*), 72 Am. Bankr.L.J. 191, 225 n. 102 (1998), *supra* note 4, at 5 (compiling and analyzing cases discussing the § 1129(b)(1) unfair discrimination issue). However, regardless of the test, the prevailing view is that the minimum requirements for finding a chapter 11 plan does not unfairly discriminate are that it has "a rational or legitimate basis for discrimination and the discrimination must be necessary for the reorganization." *Id.; see also* 7 *Collier on Bankruptcy,* ¶ 1129.04[3][a], at 1129–72; *In re 203 North LaSalle St. L.P.*, 190 B.R. 567, 585–86 (Bankr.N.D.III.1995), *aff'd sub nom. Bank of America, Illinois v. 203 North LaSalle St. Partnership*, 195 B.R. 692 (N.D.Ill.1996), *aff'd sub nom. In re 203 North LaSalle St. Partnership*, 126 F.3d 955 (7th Cir.1997), *rev'd on other grounds sub nom. Bank of America National Trust & Savings Ass'n v. 203 North LaSalle St. Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

## 2. *A New Approach*

In his article, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr.L.J. 227 (1998), Professor Bruce A. Markell, who also authored Chapter 1129 in 7 *Collier on Bankruptcy* (discussing, in part, unfair discrimination under § 1129(b)(1)), rejects these tests "as being both untrue to the historical origins of [§ 1129(b)(1)] and duplicative of other confirmation requirements." In particular, Markell "consciously rejects the prevailing view that tests the plan to see if it could be confirmed without the proposed discrimination—that is, whether the discrimination is necessary to confirm the plan." *Id.* at 228. He argues that tests incorporating the necessity element are "fatally flawed" and "meaningless" because "discrimination is never necessary" in a plan. *Id.* at 254. He explains that

> [a]ny nonindividual Chapter 11 case theoretically is capable of confirmation through plans which do not discriminate. For example, a court could confirm a liquidation plan, or it could confirm a plan that extinguished all claims and interests, created one class of new equity interests, and then distributed those interests pro rata to creditors and equity holders. With such a plan, which could be confirmed in any case, discrimination is wholly absent.

*Id.*

Markell also rejects the notion that cases discussing unfair discrimination under § 1322(b)(1) can be instructive to courts determining whether a plan unfairly discriminates under § 1129(b)(1) because these unfair discrimination provisions play different procedural roles and serve different purposes in their respective chapters.

(Bankr.E.D.Mo.1990); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 62 (Bankr.S.D.N.Y. 1990); *In re Rochem, Ltd.*, 58 B.R. 641, 643 (Bankr.D.N.J.1985). *See also National Enters. v. Ambanc La Mesa L.P.* (*In re Ambanc La Mesa L.P.*), 115 F.3d 650, 656–57 (9th Cir. 1997); *Ownby v. Jim Beck, Inc.* (*In re Jim Beck Inc.*), 214 B.R. 305, 307 (W.D.Va.1997), *aff'd*, 162 F.3d 1155, 1998 WL 546067 (4th Cir.1998).

5. *See, e.g., In re 203 North LaSalle St. L.P.*, 190 B.R. 567, 585–86 (Bankr.N.D.III.1995), *aff'd sub nom. Bank of America, Illinois v. 203 North LaSalle St. Partnership*, 195 B.R. 692 (N.D.Ill.1996), *aff'd sub nom. In re 203 North LaSalle St. Partnership*, 126 F.3d 955 (7th Cir.1997), *rev'd on other grounds sub nom. Bank of America Nat'l Trust and Savings Ass'n v. 203 North LaSalle St. Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) (reducing the four-part test to two elements: (1) whether the discrimination is "supported by a legally acceptable rationale"; and (2) whether the discrimination is "necessary in light of the rationale").

The chapter 13 unfair discrimination provision must protect *all creditors* because they do not have voting rights. Under § 1322(b)(1), a plan cannot be confirmed if it is found to unfairly discriminate. On the other hand, under chapter 11, a plan that unfairly discriminates can be confirmed if all classes vote to accept it. The unfair discrimination provision of § 1129(b)(1) protects only *dissenting classes of creditors*. *Id.* at 244–45. Because the function served by these provisions in the respective chapters differs, the standard should likewise be different according to Markell. *Id.*

Markell states that the purpose to be served by the unfair discrimination provision of § 1129(b)(1) is to set "a horizontal limit on nonconsensual confirmation" or to provide for equal treatment for all creditors holding the same priority level,[6] as opposed to the vertical limit provided by the absolute priority rule under the "fair and equitable" standard, which assures fair treatment between creditors of different priority levels. *Id.* at 227–28. To achieve this end, Markell proposes a new analysis in which a rebuttable presumption of unfair discrimination would arise where:

> there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the

dissenting class in connection with its proposed distribution.

*Id.* at 228. The plan proponent could rebut the presumption of unfairness established by a significant recovery differential by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain. The plan proponent could overcome the presumption of unfair treatment based on different risk allocation by showing that such allocation was consistent with the risk assumed by parties before the bankruptcy. *Id.*

Markell's criticism of the prevailing approach to deciding the § 1129(b)(1) unfair discrimination issue is well-founded and his reasoning in formulating the new analysis is sound. The presumption-based analysis he proposes, unlike the four-part test or modifications of it, effectively targets the kind of discrimination or disparate treatment that is commonly understood as being "unfair," namely that which causes injury or that unjustly favors one creditor over another.[7] It also provides more concrete limits on the plan proponent's ability to discriminate among classes than the four-part test, thereby offering a greater assurance that all classes of the same priority level will be treated equally. This test so realistically focuses on and balances those factors that directly impact the equality of treatment between similarly situated creditors that a plan which does not give rise to a presumption under this test must necessarily be fair. It also does not duplicate other confirmation requirements. Having thus reconsidered the pro-

---

6. Markell argues that "a holder of an unsecured claim [should start] out with the assumption that he or she will get what every other unsecured creditor gets." *Id.* at 252. He explains that "[t]his notion is protected by the general equality principle in bankruptcy as given effect by the strong-arm powers, preferences, and the requirement that each creditor be paid pro rata along with all other creditors." *Id.* (citing 11 U.S.C. §§ 544(a), 547, and 726(b)).

7. "Unfair" means "marked by injustice, [or] partiality ...." *Webster's New Collegiate Dictionary* 1268 (1979). "Injustice" in turn is synonymous with "injury," "wrong," or "an act that inflicts undeserved hurt." *Id.* at 589. "Partiality" is "the quality or state of being partial" which, in turn, is defined as "inclined to favor one party more than the other." *Id.* at 828–29.

priety of employing *Aztec's* four-part test or some modification of it, in light of experience and emerging case law, the Court rejects *Aztec* and instead adopts the test proposed by Professor Markell. However, we hasten to note that the Court's holding in this case would be the same regardless of the test employed.

### 3. *Application of the Presumption–Based Standard*

■ Applying the presumption-based standard to the facts of this case, the Proponents have carried their burden that the Plan does not unfairly discriminate against Class 18. Although it is clear that Class 18 is a dissenting class (Markell's Factor 1), and that there are other classes of unsecured creditors of the same priority level (Markell's Factor 2), because no member of Class 18 objected to confirmation, the Court has no way of knowing to which other class or classes of unsecured creditors Class 18 would compare itself for the purpose of the unfair discrimination analysis required under the third factor of the Markell test. The Court can only assume that Class 18 would compare itself to classes containing other types of personal injury tort claims, as these classes share not only the same priority status but also the fact that the constituent claims arose in a similar fashion. However, this comparison would be strained in that Class 18 is not similarly situated with any other class of tort claimants or any other class of unsecured creditors because it alone has recourse to funds derived from enforcing the Debtor's rights under indemnity agreements with AHP and Leiras Oy. The inability to designate with certainty a comparable class is however, not necessary to disposition of the case because any alleged difference in treatment between Class 18 and another class or classes of the same priority would give rise to a presumption of unfairness under the test only if the Plan provided for either a materially lower recovery or a greater allocation of risk for Class 18. This is not the case here as there is no evidence that any other class is receiving more favorable treatment than Class 18 under the Plan.

The Plan calls for payment in full of Class 18 claims through enforcement of the indemnity contracts the Debtor entered into with AHP and Leiras Oy. It is undisputed that AHP and Leiras Oy are solvent and capable of paying all LTCI claims, and intend to honor the indemnity agreements. *See Final Pre–Trial Order,* Part IV, Uncontested Facts 7 and 8, p. 12 (stating that "AHP's assets are worth approximately $20 billion ... [and] AHP's shareholders' equity is approximately $8 billion."); *Transcript,* July 30, 1999 (statement of Barbara Houser, counsel for Dow Corning Corp.), p. 80 ("AHP has consented to the assignment of the indemnity issue [sic] found that they have substantial equity value and therefore will honor the indemnities that they have agreed to do and therefore [the LTCI claims] if ever allowed against Dow Coming will be paid in full through enforcement of the indemnities."). No other class of unsecured creditors will receive more than full payment of its claims under the Plan, and therefore, it is impossible for Class 18 to seriously argue that it will recover a materially lower dollar amount on account of its claim than another class of the same priority level. Class 18's recovery is, in essence, identical to that proposed for other classes of unsecured personal injury creditors. A dollar derived from enforcement of the indemnity contracts is certainly equivalent to a dollar paid out of the Debtor's other assets.

Furthermore, the Plan does not require Class 18 to assume a materially greater risk in receiving its proposed payment. Although the Plan requires Class 18 to receive its payments from the proceeds of the indemnity and guarantee contracts, which are not available to other classes of unsecured creditors, this requirement in no way prejudices Class 18 and, at least on its face, *favors* Class 18. Under the Plan, Class 18 will be paid from sources with in excess of $20 billion dollars worth of assets while the other unsecured personal injury

claimants will receive payments from a capped fund of $400 million. Under either the presumption-based test, the four-part test or a modification of it, or the prevailing case law, the Court cannot find that the Plan, which treats a dissenting class equally with other classes of the same priority level or favors it, discriminates unfairly against the dissenting class in violation of § 1129(b)(1).

In *In re Sacred Heart Hospital of Norristown*, 182 B.R. 413 (Bankr.E.D.Pa.1995) the court faced an analogous fact pattern. There, a creditor objected to confirmation of the debtor's chapter 11 plan because it classified together "the claims of general unsecured creditors which may be covered by 'applicable insurance polic[ies]' ... owned by the Debtor," and required claimants holding these claims to seek payment first through the insurance proceeds, and then, only to the extent of a deficiency, pursue payment from the debtor on a pro rata basis along with other separately classified general unsecured creditors. *Id.* at 415–16. The objecting creditor calculated a $100,000 potential loss in recovery on its claim if allowed only to receive its percentage of payment to the general unsecured creditors class based on its deficiency amount, rather than on the entire amount of its claim. *Id.* at 416. It was undisputed that the objecting creditor's claim would not be paid in full in either case. *Id.* The objecting creditor argued that the insurance proceeds were not "property of the estate" and that the debtor could not require any creditor to look to a third party for payment. It also argued that the plan violated the § 1129(b)(1) unfair discrimination provision. *Id.* at 417.

The *Sacred Heart* court rejected these arguments and held that the insurance proceeds were "property of the estate." The court pointed out that when

> [f]aced with the typical situation in which a debtor corporation's liability policies provide the debtor and thus the estate with direct coverage against third party claims, virtually every court to

have considered the issue has concluded that the policies and clearly the proceeds of those policies are part of the debtor's bankruptcy estate ....

*Id.* at 420 (quoting *In re Vitek*, 51 F.3d 530, 534 n. 17 (5th Cir.1995)). The court, therefore, concluded that the debtor, through its plan, could control and allocate its interest in insurance proceeds just as it did other estate assets to satisfy claims. *Sacred Heart*, 182 B.R. at 421. Responding more specifically to the unfair discrimination issue raised, the *Sacred Heart* court opined "that the unsecured claims with access to insurance coverage [were] in fact significantly different from the general unsecured claims," and thus, it was permissible for the plan to treat these claims differently because "[d]issimilar treatment for dissimilar claims does not run afoul of the unfair discrimination provision [of § 1129(b)(1) ]". *Id.* at 422 n. 8. Noting that, under the proposed plan, the objecting class would recover more than the class of general unsecured creditors, in spite of the requirement that it look to insurance proceeds for payment of a portion of its claim, the *Sacred Heart* court held that discrimination which favors a class cannot serve as a ground for an unfair discrimination claim. *Id.* This holding is consistent with the presumption-based analysis that presumes a plan unfairly discriminates only where different treatment between classes of equal priority leads to either a materially lower recovery (Markell's Factor 3a) or greater allocation of risk for the dissenting class (Factor 3b).

Here, Class 18, just as the dissenting class in *Sacred Heart*, has access to an estate asset (proceeds from the indemnity and guarantee contracts) which is not available to other classes of unsecured personal injury claimants. As explained in *Sacred Heart*, this distinction allows the Plan to require Class 18 to look to the other source for payment of its claim without violating § 1129(b)(1) provided that it does not prejudice the class by causing it

to receive less or assume more risk than other classes of an equal priority standing. Therefore, because any difference in treatment under the Plan between Class 18 and the other classes of unsecured creditors is not detrimental but most likely is advantageous to Class 18, the Plan does not unfairly discriminate against this class and comports with the requirements of § 1129(b)(1).

### B. *Fair and Equitable Prong*

 The Plan also satisfies the fair and equitable prong of § 1129(b)(1). Section 1129(b)(2) sets forth the standard for determining whether a plan is fair and equitable to a class of unsecured creditor claims. It provides:

> For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements: ...
>
> (B) With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B). Under this provision, a plan will be deemed "fair and equitable" if either subsection is satisfied. Here, the Plan provides for payment in full of all Class 18 claims once their respective values are established at the Litigation Facility, thereby satisfying § 1129(b)(2)(B)(i). Therefore, the Plan is, by definition, "fair and equitable."

### Conclusion

The Plan, having met the requirements of cramdown under § 1129(b)(1) with respect to Class 18, may be confirmed in spite of the dissenting vote of this class.