In the Matter of LERNOUT & HAUS-
PIE SPEECH PRODUCTS, N.V.,
et al., Debtors.

Nos. 00–4397 to 00–4399.

United States Bankruptcy Court,
D. Delaware.

June 10, 2003.

Ira S. Dizengoff, Esq., James R. Savin, Esq., Akin, Gump, Strauss, Hauer & Feld, New York City, Francis A. Monaco, Esq., Joseph J. Bodnar, Esq., Monzack & Monaco, Wilmington, DE, for Creditors' Committee.

Luc A. Despins, Esq., Matthew Barr, Esq., Milbank, Tweed, Hadley & McCloy, LLP, New York City, Robert J. Dehney, Esq., Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Debtors.

Brett D. Fallon, Esq., Douglas N. Candeub, Esq., Morris, James, Hitchens & Williams, Wilmington, DE, for KPMG LLP.

James L. Garrity, Jr., Shearman & Sterling, New York City, Brendan L. Shannon, Esq., Young, Conaway, Stargatt & Taylor, Wilmington, DE, for Stonington.

Michael S. Etkin, Esq., Lowenstein Sandler, Roseland, NJ, for Rocker.

## OPINION ON CONFIRMATION

JUDITH H. WIZMUR, Bankruptcy Judge.

The Official Committee of Unsecured Creditors ("Committee") submitted a proposed plan of liquidation on March 11, 2003. The proposed plan seeks to allocate the debtor's assets between this Chapter 11 case and the liquidation proceeding involving the debtor which is pending in Belgium. Objections to confirmation[1] were filed by Stonington[2] and Rocker[3].

---

1. The objections of several parties, including KPMG LLP, Charles Van Damme, and Innet NV, were resolved at the hearing.

2. Stonington refers to Stonington Partners, Inc., Stonington Capital Appreciation 1994 Fund LP, and Stonington Holdings, LLC.

3. Rocker refers to Rocker Management LLC, Rocker Partners LP, Rocker Offshore Management Co. and Compass Holdings, Ltd.

Oral argument was considered and the Committee's plan confirmed on May 29, 2003. The decision rendered herein supplements and clarifies my oral determination to confirm the Committee's plan.

## FACTS AND PROCEDURAL HISTORY

Lernout & Hauspie Speech Products N.V. ("L & H NV") was formed in Belgium in 1987 as a speech and language technology company. Beginning in 1996, L & H NV began a period of acquisition and expansion. In May 2000, through a series of mergers, L & H NV acquired 96% of the stock of Dictaphone Corporation ("Dictaphone") from Stonington in exchange for L & H common stock. On June 7, 2000, L & H NV obtained Dragon Systems, Inc. through a merger with its own wholly owned subsidiary, L & H Holdings, also in exchange for L & H NV common stock. In the spring of 2000, L & H NV common stock had a market capitalization value in excess of $8 billion dollars.

On August 8, 2000, an article appeared in the Wall Street Journal questioning the integrity of L & H NV's financial statements. On August 31, 2000, apparently in response to articles in the Wall Street Journal, the SEC commenced a formal investigation of the debtor's financial circumstances. On November 15, 2000, KPMG announced that L & H NV's financial statements for 1998 and 1999 were not reliable and required restatement. Several European banks declared defaults against the debtor and accelerated the amounts outstanding. Various legal actions were commenced by Rocker and Stonington, and two class action suits were started in the Massachusetts District Court. By November 2000, when trading on the NASDAQ was suspended, L & H NV's value had fallen to $890 million.

On November 27, 2000, Stonington commenced an action in Delaware Chancery Court against L & H NV and several of its former officers and directors, alleging that the acquisition of Dictaphone for L & H stock was obtained by fraud. The state court action was later removed to the District Court. On November 28, 2000, Stonington obtained an order in Belgium directing L & H NV to turn over its shares of Dictaphone.

One day later, on November 29, 2000, L & H NV filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. L & H Holdings and Dictaphone filed separate Chapter 11 cases on the same day. A joint administration order was entered on December 5, 2000.[4] On December 1, 2000, L & H NV commenced an adversary proceeding, number 00–01998, seeking declaratory and injunctive relief against Stonington.

On December 13, 2000, the United States Trustee appointed an Official Committee of Unsecured Creditors ("the Committee") for the combined cases of L & H NV, L & H Holdings and Dictaphone. At the request of the Dictaphone creditors, a separate committee was later appointed in the Dictaphone case on March 31, 2001.

On November 29, 2000, L & H NV also commenced a bankruptcy reorganization proceeding, called a "Concordat", in Belgium (the "Belgian case"). The first Concordat reorganization proceeding was rejected by the Belgian court on December 8, 2000. The second Concordat, filed December 27, 2000, was permitted to proceed on January 5, 2001. Commissioners were appointed to oversee the management of L & H NV in the Belgian case. Ultimately, the debtor's attempts at reorganization in

---

**4.** Dictaphone emerged from Chapter 11 on March 28, 2002, and L & H Holdings emerged from Chapter 11 on September 23, 2002.

Belgium failed, when the plan presented by the debtor in the second Concordat proceeding was rejected by the Belgian court on October 18, 2001. Thereafter, five Curators, or trustees, were appointed to oversee the liquidation of L & H NV in Belgium.

Stonington filed proofs of claim in both this case and in the Belgian proceeding. In May 2001, the debtor sought and was granted a declaratory judgment that any claim asserted by Stonington would be subject to subordination under 11 U.S.C. § 510(b). The debtor then filed a second amended complaint against Stonington on June 29, 2001, and moved for partial summary judgment. The debtor asked this court to determine that a "true conflict" existed between Belgian and U.S. bankruptcy law and that the treatment of the Dictaphone merger claims should be determined by the United States Bankruptcy Court under the Bankruptcy Code. I concluded that there was a true conflict between the applicable insolvency laws of Belgium and the United States. I determined further that the "center of gravity" of the Stonington transaction was in the United States. On August 27, 2001, I granted declaratory and injunctive relief to the debtor, directing that the priority, treatment and classification of the Dictaphone merger claims would be determined by this court and that Stonington was enjoined from litigating the issue before the Belgian court. The District Court affirmed on September 17, 2001. *Lernout & Hauspie Speech Products N.V. v. Stonington Partners, Inc.*, 268 B.R. 395 (D.Del. 2001). On appeal, the Third Circuit reversed and remanded, outlining the relevant legal principles to apply on remand to the issues of the anti-suit injunction sought by the debtor against Stonington, and the choice-of-law analysis required. *Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.*, 310 F.3d 118 (3d

Cir.2002). Prior to the adjudication of the remand in this court, the debtor withdrew its quest to enjoin Stonington from pursuing its claim in the Belgian proceedings, effectively rendering the resolution of the remand from the Court of Appeals moot.

Following the withdrawal of the debtor's quest for relief against Stonington, on January 27, 2003, the L & H NV Creditors' Committee filed an emergency motion to modify the debtor's exclusivity period. This court entered an order allowing the Committee to propose its own Chapter 11 plan. On March 11, 2003, the L & H NV Committee submitted a disclosure statement and a proposed plan of liquidation. The disclosure statement was approved on April 10, 2003.

## PLAN PROVISIONS

The Committee's plan calls for the allocation of L & H NV's assets between the Belgian case and this Chapter 11 case. At this point, L & H NV's assets consist primarily of the cash generated from postpetition asset sales in the amount of $57,610,568, of which approximately $3.5 million is being held by the Belgian Curators. The remainder of the cash is being held in the United States. For liquidating potential causes of action belonging to the debtor, the plan establishes and provides funding for a Litigation Trust to pursue recoveries on behalf of the creditors ("Litigation Trust Beneficial Interests.").

The proposed allocation of the debtor's assets between the Belgian case and the Chapter 11 case was performed by Houlihan Lokey Howard & Zukin Capital, the investment banking/financial advisory firm retained by the Committee pursuant to this court's order. In particular, Lily L. Chu, a Senior Vice–President in the Financial Restructuring Group at Houlihan

Lokey, supervised the allocation process.[5] In her affidavit, Ms. Chu recites that Houlihan Lokey worked extensively with the former officers of the debtor and reviewed the debtor's documents "to allocate ownership based on, among other metrics, the location of: (a) technology development; (b) product development; (c) business operations, and (d) sales generation." Chu Affid. at 4. Post-petition cash activity was also factored in, including "(a) the repayment of DIP borrowings; (b) intercompany activities; (c) other expenses and income; and (d) estimated remaining liabilities." *Id.* at 5. Asset allocation and cash usage allocation charts are appended to the Committee's Disclosure Statement as Exhibits B and C.

A synthesis of the two allocation methodologies produced an allocation of 76.7%, or $44,168,734.00, to the Chapter 11 case and 23.3%, or $13,441,834.00, to the Belgium case. No objections have been filed either with respect to the methodology used in calculating the allocations, or the manner in which the methodology was applied.

Following the submission of the Committee's plan, on or about March 31, 2003, the debtor filed an "Emergency Motion" seeking authorization to pay out approximately $23 million on account of administrative expense claims incurred in Belgium during the Belgian insolvency proceedings. The Curators explained that the administrative claims, which included Belgian employee claims and various post-petition Belgian tax claims, were required to be paid under Belgian insolvency laws. The Curator's motion was withdrawn following

the amendment of the Committee's plan to provide for an additional allocation to the Belgian case of $5,091,386. The plan now contemplates a transfer of $14,850,000 in cash, located in the United States, plus the $3.5 million of L & H NV's assets currently in Belgium, to the Belgian Curators to be distributed to Belgian priority claims in accordance with Belgian law. The plan provides that the claims of the Belgian priority creditors will be administered solely and exclusively in the Belgian case. The Belgian priority creditors will not participate in or receive any consideration under the Chapter 11 plan. In addition, the plan was amended to provide that creditors that filed general unsecured claims solely in the Belgian case in accordance with Belgian law may have their claims administered in the Chapter 11 case and, if consistent with the Bankruptcy Code, will have their claims allowed as Chapter 11 general unsecured claims.

The Committee's plan designates five (5) classes of claims and two (2) classes of equity interests. As is relevant here, Class 3 includes all unsecured claims other than those in Class 4 (PIERS/Old Convertible Subordinated Notes Claims) and Class 6 (Securities Law Claims), and includes general unsecured claims filed in the Belgian insolvency proceedings and general unsecured claims filed in the Chapter 11 case. Class 3 will receive a ratable portion of the available cash, estimated at 4.5%, and ninety-three percent (93%) of the Litigation Trust Beneficial Interests. The pool of unsecured creditors was estimated to be $640 million in the Disclosure Statement.[6] The claims of all Class 3 creditors,

---

5. Ms. Chu has extensive experience with global financial affairs, and with bankruptcy cases involving assets jointly administered in more than one jurisdiction. She holds an undergraduate degree in Economics from Yale University, and graduate degrees from Harvard University, including a Ph.D. in Business Economics.

6. During oral argument at confirmation, Committee counsel estimated United States general unsecured claims to be about $400

including the Belgian general unsecured creditors who choose to participate in the Chapter 11 case, will be allowed and treated under the provisions of the Bankruptcy Code.

Class 6 includes Securities Law Claims, such as rescission and securities damage claims, indemnification claims or other claims related to securities violations, and includes the Rocker and Stonington claims. Class 6 claimants are impaired and are deemed to have rejected the plan. It is not expected that any distributions will be made to this class.

The plan recognizes the opportunity of all creditors to pursue their claims in this proceeding as well as before the Belgian courts, and no creditor is enjoined from doing so. The Disclosure Statement specifies that the Belgian Curators do not support the plan, but the Curators have not filed an objection to the plan, and did not object to the plan at the confirmation hearing.[7]

### DISCUSSION

■ The requirements for confirmation of a proposed Chapter 11 plan are listed in 11 U.S.C. § 1129. The proponent bears the burden of establishing the plan's compliance with each of these requirements. *In re Gulfstar Indus., Inc.*, 236 B.R. 75, 77 (M.D.Fla.1999); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 598–99 (Bankr.D.Del.2001). Creditors objecting to the proposed plan bear the burden of producing evidence to support their objection. *In re Goddard*, 212 B.R. 233, 239 n. 7 (D.N.J.1997); *Genesis Health Ven-*

*tures, Inc.*, 266 B.R. at 599. The Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to confirmation. *In re Bolton*, 188 B.R. 913, 915 (Bankr. D.Vt.1995); *In re Shadow Bay Apartments, Ltd.*, 157 B.R. 363, 365 (Bankr. S.D.Ohio 1993).

A consensual plan requires the proponent to demonstrate that the plan satisfies all thirteen elements of section 1129(a), in which case the plan must be confirmed. *Beal Bank, S.S.B. v. Waters Edge L.P.*, 248 B.R. 668, (D.Mass.2000). A nonconsensual plan requires the proponent to prove all but one of the thirteen elements, that all classes consent or are unimpaired, 11 U.S.C. § 1129(a)(8), plus the additional requirements of section 1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable. Although Class 3 creditors nearly unanimously consented to the plan,[8] the plan is not consensual as to Class 6 Securities Law Claimants.

We need not address each of the uncontested requirements of section 1129(a) and (b) with respect to the Committee's plan. I readily conclude that this liquidating plan satisfies the requirements of sections 1129(a)(2) and (a)(4) through (a)(7), and (a)(9) through (a)(13), as each of these sections is relevant here. I rely as well on my rulings on the record at the confirmation hearing, which highlighted, among

---

million, and Belgian general unsecured claims to be about $70 million. On this record, I am unable to reconcile these two conflicting presentations.

**7.** Counsel for the debtor-in-possession, which is now controlled by the Belgian Curators, reflected at the confirmation hearing that

"the Curators do not support this plan, but have not filed an objection to it … [a]nd are not here standing here today objecting to the plan, or its confirmation." T52–17 through 21 (May 29, 2003).

**8.** 99% in number and amount of Class 3 creditors voted to accept the plan.

other things, the best interest of creditor test under (a)(7), and the feasibility requirement of (a)(11). I focus instead on the concerns raised by the objectors to the plan, which implicate the plan's compliance with sections 1129(a)(3) and 1129(b).

Stonington has filed claims in both the Belgian case and the Chapter 11 case. Stonington objects to the Committee's proposal to allocate assets between this Chapter 11 case and the Belgian case, without the consent or approval of the Belgian Curators, because the plan "would accomplish exactly the opposite result to that urged by the Third Circuit" in its November 2002 decision. Stonington Obj. at 4. Stonington argues that the plan "would substantially interfere with the independent jurisdiction of the Belgian Court in a manner that is not warranted by any countervailing U.S. law or policy," in violation of international comity principles, would treat similarly situated creditors in the two proceedings unfairly and contrary to Code requirements, and would enjoin Stonington and others who filed claims in both places from pursuing their claims. Stonington Obj. at 5. Stonington's confirmation objections regarding international comity concerns focus on 11 U.S.C. § 1129(a)(3) requirements, while its concerns regarding the treatment of similarly situated creditors in Belgian and the United States pertain to the proscription under 11 U.S.C. § 1129(b) against unfair discrimination. Rocker, which is similarly situated to Stonington as a Class 6 Securities Law Claimant, joins in Stonington's objection.

1. *Section 1129(a)(3).*

■ Section 1129(a)(3) requires that the "plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Although the Code does not define "good faith" in the section 1129(a)(3) context, the term has been de-

fined alternatively as requiring: (1) that the proposed plan foster a result consistent with the Code's objectives, *In re Sylmar Plaza, L.P.,* 314 F.3d 1070, 1074 (9th Cir.2002) (must fairly "achieve[ ] a result consistent with the objectives and purposes of the Code"); *In re PWS Holding Corp.,* 228 F.3d 224, 242 (3d Cir.2000); (2) that the plan have been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, *In re Piper Aircraft Corp.,* 244 F.3d 1289, 1300 (11th Cir.2001); *In re T–H New Orleans L.P.,* 116 F.3d 790, 802 (5th Cir.1997); or (3) that there was a fundamental fairness in dealing with the creditors, *In re WCI Cable, Inc.,* 282 B.R. 457, 484 (Bankr.D.Or.2002).

Stonington contends that the Committee's plan violates 1129(a)(3) because it circumvents the Third Circuit's decision in *Stonington Partners, Inc. v. Lernout˙ & Hauspie Speech Products, N.V.,* supra, and is violative of the international comity principles highlighted by the Circuit. The proposed allocation of assets between the United States Chapter 11 case and the Belgian case, which appears to leave the Belgian Curators with only enough funds to reach Belgian priority creditors, "will effectively divest the Belgian Court of any meaningful jurisdiction, other than the oversight of priority claims there." T55–20 through 22 (May 29, 2003). Stonington urges that the existence of dual plenary bankruptcy proceedings in the United States and Belgium mandates that serious and diligent efforts be exerted to administer the assets of the debtor in the context of a single coordinated plan. Without such efforts to harmonize the conflicting interests of the two jurisdictions, a Chapter 11 plan which undertakes to allocate the debtor's assets between the two cases cannot be confirmed.

In *Stonington Partners, Inc.*, the Third Circuit stressed its "serious concern for comity" in the international arena, "particularly appropriately applied in the bankruptcy context", 310 F.3d at 126, and the need for "coordination of the two plenary proceedings," to accommodate international comity considerations. *Id.* at 132. The court described international comity as the " 'recognition which one nation extends within its own territory to the legislative, executive or judicial acts of another ... [that] should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.' " *Id.* at 126 (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971)). Referencing the use of a "protocol" in the *Maxwell* case (referring to *In re Maxwell Commun. Corp.*, 93 F.3d 1036 (2d Cir.1996)), an agreement between administrators in the United States and England which facilitated "the first world-wide plan of orderly liquidation ever achieved," *Maxwell*, 93 F.3d at 1042, the Circuit "strongly recommend[ed] ... that an actual dialog occur or be attempted between the courts of the different jurisdictions in an effort to reach an agreement as to how to proceed or, at the very least, an understanding as to the policy considerations underpinning salient aspects of the foreign laws." *Id.* at 133. The court opined that " 'bankruptcy courts may best be able to effectuate the purposes of the bankruptcy law by cooperating with foreign courts on a case-by-case basis.' " *Id.* (quoting *Maxwell*, 93 F.3d at 1053).

The "actual dialog" between this court and the Belgian court recommended by the Court of Appeals did not take place prior to this confirmation proceeding.

Earlier in the case, before the Court of Appeals issued its *Stonington* opinion, the parties had engaged in some efforts to coordinate the proceedings. According to a letter report from Luc A. Despins, Esquire, of Milbank, Tweed, Hadley & McCloy LLP, debtor's counsel herein, dated January 15, 2003, a draft protocol was sent in May 2001 to the Commissioners appointed in L & H NV's Belgian Concordat case. Mr. Despins reported that no written response to the draft was received. He reported further that "during at least two conference calls, the Commissioners advised the undersigned that such a protocol could not be adopted by a Belgian Court because to do so would be violative of Belgian 'public order.' " Letter dated January 15, 2003 at 1.

Following the issuance of the *Stonington* opinion by the Court of Appeals, the coordination of the two bankruptcy proceedings was discussed during several case conferences.[9] At the conference held on December 6, 2002, special counsel for L & H NV in Belgium was instructed to make contact with the President of the Eper Commercial Court. In early January 2003, a letter was drafted by debtor's counsel which was intended for this court's signature and was directed to the Belgian court. The letter sought to open the lines of communication between the courts and may have paved the way for developing a protocol between the two proceedings. On January 8, 2003, the parties, including Stonington, were invited to comment on the draft correspondence. At a follow-up conference on January 24, 2003, the debtor withdrew its quest to enjoin Stonington from pursuing its claims in the Belgian case, thus rendering moot the adjudication of the remand. The Committee indicated

9. Telephone conferences were held on November 22 and December 6, 2002, and January 8 and January 24, 2003.

its intent to file a liquidating plan. The letter to the Belgian court was never sent. It was anticipated that the Committee's plan might avoid the conflict between the two jurisdictions. I determined to consider the Committee's plan prior to the initiation of contact with my Belgian counterpart.[10]

I cannot conclude that the limited outreach to and lack of "actual dialog" with the Belgian court in this case causes the Committee's plan to be violative of Section 1129(a)(3), or to be otherwise unconfirmable. I take very seriously the direction of the Court of Appeals in this regard, and regret that direct contact was not made. However, as the court recognized, while such cooperation "could be advantageous to the orderly administration of justice," *Id.* at 133, it is "not required by our case precedent or any principle of law." *Id.* The Creditors Committee is correct that the "true conflict" previously presented between the two proceedings, particularly the treatment of securities fraud claims like Stonington's, need no longer be resolved. No choice-of-law analysis is necessary. No anti-suit injunction is being imposed on any creditor. All parties may participate in either or both proceedings, whether they filed claims initially only in Belgium, only in the United States or in both proceedings. All creditors may seek a distribution in both the Chapter 11 case, in which instance the claim will be treated under the Bankruptcy Code, and the Belgian case, in which instance the claim will be treated under applicable Belgian law. The confirmation order provides that "nothing in the Plan or this confirmation order shall prohibit, impede or prevent any party from pursuing a claim or taking any other action in the Belgian case, or from pursuing a claim or taking any action against any assets other than the Chapter 11 assets". Confirmation Order ¶ 29(a) at 10.

Most noteworthy on the issue of international comity and deference to Belgian judicial proceedings is the apparent acquiescence of the Curators to the terms of the plan. As noted above, although the Curators do not affirmatively support the plan, they have not filed an objection to the plan and did not object to the plan at the confirmation hearing. In other matters since their appointment in October 2001, the Curators, through debtor's counsel, have made their positions known. While the initial plan proposed by the Creditors Committee was pending, the Curators filed an emergency motion on March 31, 2003 to receive authorization to disburse $23 million dollars of debtor's assets to pay Belgian administrative claims. That motion was withdrawn when the Creditors Committee agreed to increase the funds to be allocated to the Belgian case by $5 million dollars, and agreed to allow Belgian general unsecured creditors to be administered as Class 3 creditors within this Chapter 11 plan. According to counsel for the Committee, the Curators' silence at the confirmation hearings signifies a plan that the curators "can live with, because if they could not live with it . . . they would have [ ] objected." T15–9 through 11 (May 29, 2003). Committee counsel reflected at oral argument that provisions of the Litigation Trust Agreement, which is established in the plan to liquidate potential causes of action belonging to the debtor, include cooperative paragraphs between the Curators and the Litigation Trustee, including mutual access to books and records in both jurisdictions, which was draft-

---

10. Counsel for the committee stated at oral argument during the confirmation hearing that the Curators were consulted about the draft letter, and advised debtor's counsel and the Committee "unequivocally [that] this will not work." T82–8 (May 29, 2003).

ed with Curator participation and cooperation. *Id.* at T21–23 through T22–9.

Counsel for Stonington acknowledged at the confirmation hearing that if every reasonable effort was made to harmonize the conflicting interests and to coordinate the two proceedings by the parties, by the court, or both, and if those efforts were unsuccessful, "I don't know if Stonington would have a meaningful objection at that point." *Id.* at T69–12 through 13. According to Stonington, to give content to the Third Circuit's direction regarding international comity considerations for dual plenary insolvency proceedings, there must be diligent effort to administer the assets as a single case. Only when such an effort is unsuccessful can this court proceed to allocate assets between the two proceedings, and to authorize the administration of the Chapter 11 assets.

I do not believe that the circumstances of this case support Stonington's argument. The Curators, who are fiduciaries of the Belgian insolvency estate, have not objected to this plan. There has been no contest regarding the methodology used in arriving at an allocation, or the manner in which it was calculated. A sophisticated, deliberate and expert process was employed to achieve the allocation. The fact that insufficient effort was undertaken by this court or by the parties to coordinate the two proceedings does not preclude a conclusion that this plan has been proposed in good faith and not by any means forbidden by law. While it is true that creditors who pursue their claims in the Belgian case will have a more limited pool of assets from which to seek a distribution than creditors who pursue their claims in the Chapter 11 case, that fact does not cause the plan to be inconsistent with Bankruptcy Code objectives or to defeat the honesty and good intentions of the plan proponent. I conclude that the plan

proponent has established compliance with the good faith requirement of section 1129(a)(3).

### 2. *Section 1129(b)(1).*

Where, as here, at least one impaired class of claims has not consented to the proposed plan, the "cram down" provisions of 11 U.S.C. § 1129(b)(1) come into play. The cram down provisions require confirmation "if the plan does not discriminate unfairly, and is fair and equitable" with respect to each impaired non-consenting plan. 11 U.S.C. § 1129(b)(1). Stonington contends that the plan discriminates unfairly because similarly situated creditors in the two pending insolvency proceedings in the United States and Belgium are treated differently by the Committee's plan.

The concept of unfair discrimination is not defined under the Bankruptcy Code. Various standards have been developed by the courts to test whether or not a plan unfairly discriminates. *In re Dow Corning Corp.,* 244 B.R. 705, 710 (Bankr. E.D.Mich.1999). *See also* G. ERIC BRUNSTAD, JR. AND MIKE SIGAL, "Competitive Choice Theory and the Unresolved Doctrines of Classification and Unfair Discrimination in Business Reorganizations Under the Bankruptcy Code", 55 BUS.LAW 1, 46–48 (Nov.1999) (describing various tests). The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination. *See, e.g., In re Ambanc La Mesa L.P.,* 115 F.3d 650, 656 (9th Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *In re Jim Beck, Inc.,* 214 B.R. 305, 307 (W.D.Va.1997), *aff'd,* 162 F.3d 1155 (4th Cir.1998); *In re Salem Suede, Inc.,* 219 B.R. 922, 933 (Bankr.D.Mass.1998) ("if the plan protects the legal rights of a

dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate unfairly") (quoting KENNETH N. KLEE, "All You Ever Wanted to Know About Cram Down under the New Bankruptcy Code", 53 AM.BANKR.L.J. 133, 142 (1979)); *In re Crosscreek Aparts., Ltd.*, 213 B.R. 521, 537 (Bankr.E.D.Tenn.1997) ("at a minimum there must be a rational or legitimate basis for the discrimination and the discrimination must be necessary for the reorganization"); *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr.M.D.Tenn.1989) (describing various tests and listing cases). Other courts apply the standard only in the context of subordinated claims or interests, *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir.1986), or require similarly situated creditors to receive their "exact aliquot distribution". *In re Greystone III Joint Venture*, 102 B.R. 560, 571 n. 16 (Bankr. W.D.Tex.1989), *aff'd*, 127 B.R. 138 (W.D.Tex.1990), *rev'd on other grounds*, 995 F.2d 1274 (5th Cir.1991).

More recently, one court has adopted a modified test for unfair discrimination, which gives rise to:

> a rebuttable presumption that a plan is unfairly discriminatory . . . when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr.E.D.Mich.1999) (adopting the test proposed in BRUCE A. MARKELL, "A New Perspective on Unfair Discrimination in Chapter 11", 72 AM.BANKR.L.J. 227 (1998)). *See also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228–29 (Bankr.D.N.J.2000).

■ Here, Stonington is treated differently from general unsecured creditors in Class 3 of the plan. Its treatment as a Class 6 subordinated creditor is premised upon a declaratory judgment entered in May 2001, in this court, in favor of the debtor, which imposed mandatory subordination under 11 U.S.C. § 510(b) on Stonington's claims. The decision was based upon the fact that Stonington's claims arose from the rescission of a purchase or sale of a security of the debtor. The ruling was not appealed by Stonington. There is a legitimate basis to discriminate between Class 3 general unsecured creditors and Stonington.

■ As to the purported discrimination between Stonington and other Class 6 securities fraud claimants, and Belgian general unsecured creditors, no such discrimination is provided for in the Chapter 11 plan. Belgian general unsecured creditors may participate in the Chapter 11 case as Class 3 claimants. However, their claims are subject to allowance and treatment under the Bankruptcy Code. Therefore, any Belgian securities fraud claims will be treated in the same manner as Stonington and other Class 6 claimants, i.e., subordinated to Class 3 general unsecured claims.

The Committee is correct to interpret Stonington's assertion of unfair discrimination as a quest by Stonington to have its claim treated in a manner consistent with the treatment that would be afforded to its claim in the Belgian case. "The fact that under the laws of [Belgium] Stonington would be entitled to a different treatment does not mean that the plan discriminates unfairly." Committee's Memorandum of Law at 38.

I highlight here the plan provision that all creditors, including creditors who have filed claims only in the Chapter 11 case, creditors who have filed only in the Belgian case, and creditors who have filed in both cases, may participate in the Chapter 11 case. They may also participate in the Belgian case. Each creditor's claim will be treated in the Chapter 11 case pursuant to the Bankruptcy Code. No party is enjoined from pursuing its claim in the Belgian case.

■ Based on the foregoing, I conclude that the plan proposed by the Creditors' Committee satisfies the requirements of 1129(a) and (b), and may be confirmed. In reaching this conclusion, I am mindful of and sympathetic to the circumstances of Stonington, an American ERISA fiduciary which manages institutional capital on behalf of various public and private entities, including pension funds, private endowments and financial institutions. *Stonington Partners, Inc.*, 310 F.3d at 122. Stonington was induced, through massive fraud, by the debtor's pre-petition principals, to acquire L & H NV stock and to enter into merger agreements. There is little likelihood that Stonington will achieve any distribution from the Chapter 11 plan. Nevertheless, I have no opportunity to depart on equitable grounds from the impact of subordination under 11 U.S.C. § 510(b), or to avoid confirming a plan that otherwise comports with § 1129 requirements.

An order was entered on May 30, 2003.